**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AQUA PENNSYLVANIA, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ARKEMA INC. individually and as successor | : | CIVIL NO: |
| to Sartomer USA, LLC | : | |
| | : | |
| Defendant. | : | |

---

## COMPLAINT

Plaintiff AQUA PENNSYLVANIA, INC. ("**Plaintiff**" or "**Aqua**"), by and through its undersigned counsel, hereby files this Complaint against Defendant ARKEMA INC., individually and as successor in interest to Sartomer USA, LLC ("**Arkema**" or "**Defendant**"), and alleges, upon information and belief, the following:

### I.     INTRODUCTION

1.     This action arises from the contamination of the source waters for a significant segment of Plaintiff's "Main System" (PWSID No. PA1460073 ) public drinking water system ("**PWS**") ("**Main System**") with dangerous per- and poly-fluoroalkyl substances ("**PFAS**") including perfluorooctanesulfonic acid ("**PFOS**"), perfluorooctanoic acid ("**PFOA**") and perfluoononanoic acid ("**PFNA**"). The affected water system portion of Main System that is the subject of this suit (referred to herein as the "**Water System**") serves a large portion of Delaware County, Pennsylvania and a maller, but significantly sized, area and population of Chester County, Pennsylvania.

2.  Plaintiff is a wholly owned corporate subsidiary of Essential Utilities, Inc.. It is in the business of owning and/or operating public water and sewage treatment utilities throughout the Commonwealth of Pennsylvania. Plaintiff holds the authority to operate such utilities under and pursuant to certificates of public convenience issued by the Pennsylvania Public Utility Commission ("**PUC**"). Under and pursuant to these PUC certificates, as well as tariffs approved by the PUC, Aqua owns and operates public water systems ("**PWS**") and wastewater treatment plants in specific territories in the Commonwealth, including, so far as relevant here, PWSs and wastewater treatment facilities in Southeastern Pennsylvania.

3.  Plaintiff's public water service and wastewater treatment operations are highly regulated by several governmental agencies. Its operations and services therefore must abide by and comply with the various tariffs, rules and regulations controlling PWSs and wastewater treatment facilities, including those addressing safety, quality and quantity water matters that are issued, adopted or approved by the PUC, the United States Department of Environmental Protection ("**EPA**"), the Pennsylvania Department of Environmental Protection ("**PaDEP**") and various river basin commissions and other sovereign entity compacts governing or relating to the Waters of the Commonwealth.

4.  Federal and Pennsylvania water standards currently in force control the amount of certain PFASs that may be present in  drinking water. These standards prohibit the presence of highly minute (*i.e.*, in the low parts per trillion) levels of PFOA, PFOS  and PFNA in water that Aqua serves to its customers. Where and when these PFAS chemicals are either (a) detected in Aqua's water sources, drinking water treatment plants, or waste water treatment plants; or (2) threaten Aqua's water sources, or the water being processed in its treatment plants or distributed to its customers, or its waste water treatment plants' operations with contamination, Aqua needs

to take—and has taken timely— reasonable and appropriate response actions to protect its water sources, water treatment and distribution systems and wastewater treatment assets in order to serve its customers and protect the public's health, well-being and convenience.

5.     Among the public water systems Plaintiff operates in Southeastern Pennsylvania is its so called "Main System" system. The Main System is a large scale, multi-county PWS that draws water from surface sources (rivers and creeks) and from wells. The Main System serves numerous suburban Philadelphia communities. Among those supplied drinking water through the subject portion of Aqua's Main System referred to herein as the "**Water System**" are approximately 16,000 customers located in the Delaware County Pennsylvania boroughs of Media and Rose Valley and the adjacent communities of Middletown,  Upper Providence, Nether Providence, Chester Heights, Aston, Marple, and Ridley Townships.

6.     The Water System segment serving the affected Delaware County area at issue utilizes two surface water intakes as sources: one that collects surface water from Ridley Creek and one which that collects surface water from Chester Creek.

7.     On information and belief, Defendant Arkema Inc. and its predecessors in interest, Sartomer USA, LLC; Sartomer Company, Inc.; Sartomer Company; Orkem Acquisition Corp.; and Sartomer Resins, Inc., are or were the current and former owners, possessors, and/or operators of a manufacturing facility in West Chester, Pennsylvania located at 610 S. Bolmar Street (the "**Bolmar Street facility**"). Defendant Arkema Inc. and its predecessors in interest Sartomer USA, LLC; Sartomer Company, Inc.; Sartomer Company; Orkem Acquisition Corp.; and Sartomer Resins, Inc. are hereinafter referred to as the "**Arkema Entities**."

8.     On information and belief, since acquiring the Bolmar Street facility in the 1960s, the Arkema Entities have used it to manufacture acrylates and other specialty chemicals used in,

among other things, surface coatings, adhesives, and sealants, as well as in the electronics industries.

9.      On information and belief, PFAS (including PFOA, PFOS and PFNA) were used as an ingredient and/or processing aid in the production of certain chemicals or products manufactured at the Bolmar Street facility.

10.      The Bolmar Street facility lies in and along the Goose Creek watershed and the facility, Goose Creek  and the Goose Creek watershed are all located upstream from the Plaintiff's Water System's Chester Creek drinking water intake.

11.      In early 2019, Plaintiff began testing surface water at different locations along Goose Creek for the presence of PFASs. The testing revealed high levels of PFOS, PFOA, and PFNA that tended to increase in amount in the testing sites that were located downstream from the Arkema Entities' Bolmar Street facility. This indicated that the Bolmar Street facility was a source of the PFAS.

12.      In August 2019, the U.S. Environmental Protection Agency ("EPA") mobilized its own field sampling team to test the surface water in the Goose Creek watershed for the presence of PFAS. EPA's testing confirmed Plaintiff's prior sampling results showing significant contamination with PFOA, PFOS, and PFNA that increased in the testing locations located downstream from the Arkema Entities' Bolmar Street facility. This round of testing likewise indicated that the Bolmar Street facility was a source of the PFAS flowing ultimately towards Plaintiffs' Water System located downstream from the testing sites.

13.      Defendant at times material herein knew, had reason to know and/or should have known that toxic PFAS chemicals like PFOS, PFOA, and PFNA persist in the environment and

bio-accumulate in humans and pose a significant risk to human health at elevated levels of exposure.

14.     Defendant at times material herein knew or should have known that the improper use, transport, storage, handling, release, discharge, and/or disposal of PFOS, PFOA, PFNA, and/or their chemical precursors, posed a foreseeable threat to sensitive receptors such as public water suppliers because all three of these PFASs resist biodegradation, move easily in water, and are expensive to treat.

15.     On information and belief, hazardous PFAS chemicals, including PFOS, PFOA and/or PFNA, associated with Defendant's facility were released or discharged onto, at, upon or from the Bolmar Street facility and into the environment which have contaminated, or threaten to contaminate, the Waters of the Commonwealth supplying Plaintiff's Main System, and in particular the Water System that is the subject of this suit. To the extent the PFAS polluted waters ultimately are directed to Plaintiffs wastewater treatment plant ("WWTP") in Media, Pennsylvania, Plaintiff's Media WWTP is also affected or threatened.

16.     On information and belief, Defendant's improper use, transport, storage, handling, release, discharge, and/or disposal of PFOS, PFOA, PFNA, and/or their chemical precursors, at the Bolmar Street facility has contaminated the drinking water sources utilized by Plaintiff's Water System. As a result, Plaintiff already has been—and in the future will continue to be—forced to take measures in response to the PFAS pollution or threat of same emanating from the Bolmar Street facility. Such response action and costs include, among others: incurring new or additional expenses to monitor for PFAS pollution; to treat existing water supply sources and/or WWTP effluents and residuals; to obtain alternative water sources or supplies; and/or to plan and execute the expansion, extension and/or modification of other facilities or segments of the Main System in

order to provide a continuing and reliable source of clean safe water to its customers. Plaintiff as a further result will also incur costs for the sampling and testing needed to continue monitoring the Water System for PFAS contamination in the future.

17. Plaintiff brings this action to recover past and future costs associated with investigating, monitoring, remediating, and otherwise responding to the contamination directly and proximately caused by Defendant's improper use, transport, storage, handling, release, release, discharge, and/or disposal of and other acts, omissions or activities relating to PFAS or products containing PFAS at the Bolmar Street facility. This suit is separate from and without prejudice to any other suit or claims (known or unknown) relating to PFAS. For avoidance of doubt, this action is not asserting or addressing any of Plaintiff's PFAS claims arising from or connected to Aqueous Film-Forming Foam ("**AFFF**"). Therefore, this suit and the claims asserted herein are without prejudice to: (a) Plaintiff's pending PFAS claims arising from, with respect to and/or relating to AFFF which are the subject of suits it filed in its own right or were filed on its behalf in which they are absent class members presently pending in the AFFF MDL, MDL No. 2:18-mn-2873-RMG (D. S.C.) ("**AFFF MDL**"), including without limitation its lawsuits and/or its class action class member settlement claims filed or to be filed with the AFFF MDL's Settlement Claims Administrator(s); and (b) any claims that are not expressly released by it pursuant to the terms of the AFFF MDL Class Action settlements it has not opted-out from.

## II.     JURISDICTION AND VENUE

18. Plaintiff brings this civil suit, in part, pursuant to 42 U.S.C. §§ 9607, 9607(a), and 9613(g)(2) of the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"). This Court thus has jurisdiction over the claims herein by Plaintiff arising under federal law pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b). This Court also has jurisdiction over the subject matter of the claims made herein under state law in this action under 28 U.S.C.

§ 1367(a) (supplemental jurisdiction) because the claims under state law arise out of the same common nucleus of facts as the federal question jurisdiction claims set forth in this Complaint and they are so closely related to the actions brought under federal law that they form part of the same case or controversy.

19.    Venue is proper in this district under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because a release or threatened release of hazardous substances into the environment, and the other events or omissions that give rise to the claims herein, occurred in this judicial district.

20.    Defendant Arkema Inc. is subject to general personal jurisdiction under 42 Pa. Cons. Stat. § 5301 because it is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 900 First Avenue, King of Prussia, PA 19406.

## III.    PARTIES

### A.    Plaintiff

21.    Plaintiff is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 762 Lancaster Avenue, Bryn Mawr, PA 19010.

22.    Plaintiff, as alleged above, owns and, pursuant to certificates of public convenience granted by the PUC, operates the Main System public water system. Among the communities supplied drinking water through the subject portion of the Main System referred to as the "Water System" are approximately 16,000 customers located in the Delaware County Pennsylvania boroughs of Media and Rose Valley and the adjacent communities of Middletown, Upper Providence, Nether Providence, Chester Heights, Aston, Marple, and Ridley Townships.

23.    In accordance with its certificates of public convenience, permits issued by the Pennsylvania Department of Environmental Protection and its withdraw rights/authorization

granted by the Delaware River Basin Commission, Plaintiff's Water System obtains water from two surface water intakes that draw surface water from Ridley Creek and Chester Creek.

24.     Plaintiff has significant rights and property interests in the water and water sources it appropriates through the two surface intakes that supply its Water System. The past, present, and continuing contamination of those water sources with PFASs, including but not limited to PFOS, PFOA, and/or PFNA, inflicts damage and harm upon Aqua PA and constitutes injury to its property and interests for which Plaintiff is entitled to, and hereby does, seek damages and other appropriate relief. The existence of PFAS pollutants in the Waters of the Commonwealth supplying Plaintiff's Water System's source separately and apart inflicts ongoing and continuing damage and harm and constitutes injury to those interests for which Plaintiff is entitled to, and hereby does, seek damages and other appropriate relief.

**B.     Defendant**

25.     Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

26.     On information and belief, Defendant is a current or former owner, possessor, and/or operator of the Bolmar Street facility as described above.

27.     On information and belief, Defendant used the Bolmar Street facility as a manufacturing site for products containing and/or utilizing PFAS in their fabrication or composition, including but not limited PFOS, PFOA, PFNA, and/or one or more of their respective chemical precursors which in turn formed a hazardous PFAS.

28.     On information and belief, as a result of Defendant's manufacturing, handling, storage and/or disposal activities at the Bolmar Street facility, PFOS, PFOA, PFNA, and/or their chemical precursors were discharged or released into the environment, migrated from the site or

place of discharge and eventually contaminated Plaintiff's Main System drinking water supply, and in particular, the portion of the Main System serving the greater West Chester area.

29.    Defendant's wrongful actions and omissions, which are contributing to the presence of PFAS and other toxic chemicals in Plaintiff's Water System, are continuing and ongoing.

30.    At all times material herein Defendant acted by and through its respective agents, servants, officers and employees, actual, apparent or ostensible, any and all of whom were acting then and there withing the course and scope of their actual, apparent or ostensible duties and/or authority.

### IV.    FACTUAL ALLEGATIONS AS TO ALL COUNTS

#### A.    Background on PFAS and Their Associated Risks to the Environment and Human Health

31.    PFAS are chemical compounds containing fluorine and carbon atoms. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

32.    The two most widely studied types of these substances are PFOA and PFOS, which each contain eight carbon atoms.

33.    More recent research has focused on a wider range of PFAS, including PFNA, a perfluorinated carboxylic acid containing nine carbon atoms. Because PFOA and PFNA are closely related chemicals that share similar properties, information about PFOA can be used when evaluating the environmental and health hazards posed by PFNA.

34.    PFOS, PFOA, and PFNA are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOS, PFOA, and PFNA are

thermally, chemically, and biologically stable and they resist degradation due to light, water, and biological processes.

35.    PFOS, PFOA, and PFNA have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning they pose serious health risks to humans and animals at elevated levels of exposure. Because of these properties, all three chemicals pose significant threats to public health and the environment.

36.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

37.    PFOS, PFOA, and PFNA bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. In humans, PFOS, PFOA, and PFNA remain in the body for years. Additionally, PFOS, PFOA, and PFNA biomagnify up the food chain, such as when humans eat fish that have ingested PFOA, PFOS, and/or PFNA.

38.    One way that PFOS, PFOA, and PFNA get into the environment is from discharges at industrial facilities that use PFOS, PFOA, PFNA, and/or their chemical precursors to manufacture other products or chemicals.

39.    PFOS, PFOA, and PFNA can remain in the environment, particularly in water, for many decades and can move through soil and into groundwater or enter and be carried in air.

40.     The extreme persistence of PFOS, PFOA, and PFNA in the environment, along with their toxicity, mobility, and potential for bioaccumulation, pose potential adverse effects to human health and the environment at elevated levels of exposure.

41.     Exposure to elevated levels of PFOS, PFOA, and PFNA are hazardous substances in that they can be toxic and may pose serious health risks to humans and to animals. Human health effects associated with exposure to elevated levels of PFOS, PFOA, and PFNA include kidney and testicular cancer, thyroid disease, immune system effects, high cholesterol, ulcerative colitis, liver abnormalities, low birthweight, and pregnancy-induced hypertension (also known as preeclampsia). In laboratory testing on animals, PFOS, PFOA, and PFNA have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

42.     These injuries can arise and manifest months or years after exposure to PFOS, PFOA, and PFNA.

**B.    Regulatory Response to the Environmental and Human Health Risks Posed by PFAS**

43.     On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3 Rule"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[1]

44.     In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and development of safe

---

[1] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[2]

45.     On May 25, 2016, the EPA released a lifetime health advisory ("Health Advisory") and health effects support documents for PFOS and PFOA.[3] The EPA developed the Health Advisory to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA Health Advisory identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The Health Advisories were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOS. These studies indicate that exposure to PFOS and PFOA over these levels may result in adverse health effects, including:

   a.  Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

   b.  Cancer (testicular and kidney);

   c.  Liver effects (tissue damage);

   d.  Immune effects (e.g., antibody production and immunity);

   e.  Thyroid disease and other effects (e.g., cholesterol changes).

---

[2] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[3] Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

46.     In addition, PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health."[4]

47.     In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFAS. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[5]

48.     IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[6]

49.     California added PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[7]

50.     The U.S. Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 million to remediate PFAS

---

[4] *Id.*; *see also National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.").

[5] U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

[6] Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[7] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

contamination from military bases, as well as devoting $7 million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.[8]

51.     In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and the EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[9]

52.     In January 2023, Pennsylvania established maximum contaminant levels ("MCLs") for two PFAS chemicals in drinking water, 14 ppt for PFOA and 18 ppt for PFOS.

53.     As its understanding of the human health impacts of PFAS grew, on April 10, 2024, EPA announced enforceable levels for PFOA, PFOS, and PFNA in drinking water. EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L) and for PFNA at 10.0 ppt or ng/L.

54.     Effective July 9, 2024, the EPA designated both PFOA and PFOS as "hazardous substances" under CERCLA, based on its determination that "they may present a substantial danger to the public health or welfare or the environment when released."[10] Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

---

[8] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

[9] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

[10] Final Rule, Designation of Perfluorooctanic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024) (https://www.govinfo.gov/app/details/FR-2024-05-08/2024-08547).

C.    **The Arkema Entities' Manufacture of Specialty Chemical Products Using PFAS at the Bolmar Street Facility**

55.    On information and belief, Sartomer Resins, Inc. opened the Bolmar Street facility in or around October 1966.

56.    On information and belief, Sartomer Resins was purchased by Atlantic Richfield in 1981 and renamed Sartomer Company.

57.    On information and belief, Sartomer Company merged with the Specialty Chemicals Division of ARCO Chemical Company in 1985 and was sold to the French chemical company Orkem three years after that.

58.    On information and belief, following the acquisition by Orkem, ownership of the Bolmar Street facility passed to Orkem Acquisition Corp., which changed its name to Sartomer Company, Inc. on November 9, 1988.

59.    On information and belief, Sartomer Company, Inc. became a wholly-owned subsidiary of Total SE (then called Total CFP) in 1990 as a result of the French government's restructuring of the country's chemical industry.

60.    On information and belief, Total SE undertook efforts in late 2009 to realign the business units of Sartomer Company, Inc. and sister company Cray Valley. As a result of these restructuring efforts, Sartomer Company, Inc. changed its name to Sartomer USA, LLC on November 6, 2009.

61.    On information and belief, Sartomer USA, LLC became a wholly owned subsidiary of Arkema after its corporate parent, Arkema S.A., acquired the company from Total SE in late 2011. On information and belief, Sartomer USA, LLC retained ownership of the Bolmar Street facility following the acquisition.

15

62.     On information and belief, Sartomer USA, LLC was merged into Arkema on December 31, 2013, after which ownership of the Bolmar Street facility transferred to Arkema.

63.     On information and belief, the Arkema Entities have used the Bolmar Street facility for more than 40 years as a manufacturing site for acrylates and other specialty chemicals.

64.     On information and belief, the Arkema Entities used PFAS, including PFOS, PFOA, PFNA, and/or their chemical precursors, as an ingredient and/or processing aid for certain chemicals manufactured at the Bolmar Street facility.

65.     On information and belief, the Arkema Entities' improper use, transport, storage, handling, release, discharge, and/or disposal of PFOS, PFOA, PFNA, and/or their chemical precursors permitted or caused releases of these hazardous, toxic and noxious PFASs into the environment proximately causing surface and groundwater sources utilized by Plaintiff's Water System to become contaminated with PFAS.

**D.      Defendant's Contamination of the Goose Creek Watershed with PFAS.**

66.     In January and February of 2019, Plaintiff began testing the surface water at different locations along the Goose Creek watershed for the presence of several PFAS chemicals, including PFOS, PFOA, and PFNA. Specifically, Plaintiff performed PFAS testing of the surface water at locations between Union Street in West Chester, Pennsylvania and the Goose Creek Wastewater Treatment Plant discharge site. Figure 1 below depicts the area Plaintiff studied.

*Figure 1*

West Chester Pa Sampling Area



67.     Moving in order downstream, Plaintiff tested samples collected from the following four locations in January/February 2019: (1) Union Street; (2) Fenceline; (3) Lacey Street; and (4) Nields Street. Results from the initial testing performed for PFOS, PFOA, and PFNA at each site were as follows:

| Testing Site – Collection Date | PFOS (ppt) | PFOA (ppt) | PFNA (ppt) |
|---|---|---|---|
| Union St. – 2/6/2019 | 12 | 24 | 14 |
| Fenceline – 2/22/2019 | 21 | 29 | 490 |
| Lacey Street – 2/6/2019 | 38 | 111 | 1,704 |
| Nields Street – 2/6/2019 | 32 | 55 | 1,133 |

68.    In August 2019, the EPA did its own testing of the surface water along the Goose

Creek watershed for the presence of PFAS chemicals. EPA collected samples from the four

locations Plaintiff had tested earlier in the year, along with additional samples drawn from the

following five locations: (1) Montgomery Avenue; (2) Westtown Road; (3) Greenfield Park; (4)

Mostellar Park; and (5) upstream from the Goose Creek POTW discharge.

69.    In downstream flowing order, the PFOS, PFOA and PFNA results for the nine

locations EPA tested were:

| Testing Site – Collection Date | PFOS (ppt) | PFOA (ppt) | PFNA (ppt) |
|---|---|---|---|
| Montgomery Avenue – 8/28/2019 | 10.2 | 17 | N/A |
| Westtown Road – 8/28/2019 | 21.8 | 53.9 | 11.3 |
| Union St – 8/28/2019 | 16.5 | 19.1 | 16.8 |
| Fenceline – 8/28/2019 | 13.4 | 17.9 | 42.1 |
| Lacey Street – 8/28/2019 | 42.7 | 40.7 | 685 |
| Nields Street – 8/28/2019 | 44.9 | 43 | 951 |
| Greenfield Park – 8/28/2019 | 46.9 | 48.2 | 950 |
| Mosteller Park – 8/28/2019 | 704 | 62.1 | 1,810 |
| Goose Creek POTW – 8/29/2019 | 158 | 61.4 | 870 |

70.    In November 2019, EPA issued a report with the results from its testing of the Goose

Creek watershed. The report states that its results were "generally consistent" with Plaintiff's testing

in January/February 2019 and "confirm[ed] the presence of certain PFAS in Goose Creek."

71.    Discussing its testing results for PFNA and PFOS, EPA observed in that same

report:

> Surface water samples from Goose Creek show a marked rise in PFNA
> (Perfluorononanoic acid) beginning at Lacey Street (685 ppt) and
> continuing downstream to Nields Street (951 ppt), Greenfield Park (950
> ppt), Mosteller Park (1,810 ppt), and Goose Creek 75-100 meters upstream
> of the POTW discharge (870 ppt).
>
> A rise in PFOS (Perfluorooctane sulfonate) is also observable in Goose
> Creek surface water near Mosteller Park, where the PFOS concentration
> was 704 ppt. USEPA has established a Health Advisory Level for PFOS
> and PFOA in drinking water of 70 ppt. Although these samples were not

drinking water samples, they represent source water for Public Water Systems.

72.    EPA's sampling exceeds the agency's present MCLs for PFOA and PFOS (4.0 ppt) and for PFNA  (10 ppt).

73.    During the fall of 2019, Plaintiff embarked on a second round of testing along the Goose Creek watershed aimed at identifying potential sources of the contamination it had found in assays and confirmed by EPA in its sampling in August 2019.

74.    The testing performed by Plaintiff in the fall of 2019 focused on the Arkema Entities' Bolmar Street facility, which was located downstream from Plaintiff's original testing sites but upstream from the Mostellar Park site tested by EPA in August 2019.

75.    Although Plaintiff's testing reported PFOA and PFNA levels comparable to those found upstream at the Lacey and Nields Street locations, there was a marked increase in the levels of PFOS observed at the Mostellar Park location:

| Testing Site – Collection Date | PFOS (ppt) | PFOA (ppt) | PFNA (ppt) |
|---|---|---|---|
| Union St. – 2/6/2019 | 12 | 24 | 14 |
| Fenceline – 2/22/2019 | 21 | 29 | 490 |
| Lacey Street – 2/6/2019 | 38 | 111 | 1,704 |
| Nields Street – 2/6/2019 | 32 | 55 | 1,133 |
| *Mostellar Park – 9/25/2019* | 171 | 63 | 823 |
| *Mostellar Park – 10/15/2019* | 260 | 80 | 990 |

76.    Plaintiff's PFOS results from the Mostellar Park site were also consistent with EPA's testing of the Bolmar Street facility's industrial wastewater discharge to the Goose Creek wastewater treatment plant that showed PFOS concentrations ranging from 61.7 ppt to 91.2 ppt.

77.    EPA's findings of PFNA upstream to the Bolmar Street facility (at the Neilds Street sampling location) compared to results drawn downstream from that facility at Mostellar Park

further implicates the Akema Entities' Bolmar Street facility as a significant PFAS contamination source:

| Testing Site – Collection Date | PFNA (ppt) Results |
|---|---|
| EPA, Neilds Street – 8/28/2019 | 951 |
| EPA, Mostellar Park – 8/28/2019 | 1,810 |

**E.    Contamination of Plaintiff's Water System and Resulting Damages**

78.    As EPA acknowledged in its November 2019 report, although the samples tested by Plaintiff and EPA were not drinking water samples, they did represent source water for Plaintiff's Water System.

79.    One of the sources for Plaintiff's Water System is a surface water intake along the Chester Creek watershed that is located downstream from the Bolmar Street facility.

80.    After EPA issued its report in November 2019, Plaintiff tested the surface water at its Chester Creek intake for the presence of multiple PFAS chemicals, including PFOS, PFOA, and PFNA.

81.    Plaintiff's testing has revealed PFOS, PFOA, and PFNA levels that exceed EPA's drinking water MCLs of 4.0 ppt for PFOA and PFOS, and 10 ppt for PFNA

82.    As a result of the presence of the PFAS chemicals in the source water used for its Water System, Plaintiff has already incurred and will in the future be forced to incur costs associated with investigating, monitoring, remediating, and otherwise responding to the contamination of its Water System in West Chester to stem the threat to public health and the environment caused by Defendant.

83.    Specifically, Plaintiff has incurred and/or  will be forced to incur significant costs relating to all or some of the following: (a) sampling its water for PFOS, PFOA, and PFNA for the next 100 years, (b) obtaining new water sources or extending and/or modifying the existing water

distribution system; (c) designing, permitting, constructing, operating and/or maintaining treatment systems to remove the PFAS contamination; (d) determining the source and of the PFAS contamination; and (e) investigating the existing or potential changes in the character of the sources of water supply.

84.     Plaintiff should not bear these costs; they should be borne by Defendant who is responsible for the contamination of Plaintiff's Water System with PFOS, PFOA, and PFNA.

## V.     SUBSTANTIVE COUNTS
### COUNT I
**Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)**

85.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

86.     Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

87.     Defendant is an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

88.     Defendant's Bolmar Street plant is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

89.     PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

90.     There has been a release, and continue to be releases, and/or disposal of hazardous substances and other PFAS from Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

91.     The hazardous substances and PFAS released from Defendant's facility have already entered into Plaintiff's water supply and have and will continue to migrating towards or into Plaintiff's water supply both inflicting or threatening to inflict harm to Plaintiff's water sources

92.     Plaintiff has incurred and will continue in the future to incur necessary response costs to address the release and harm or threatened release and harm of hazardous substances and PFAS from Defendant's facility.

93.     Plaintiffs actions and measures taken in response to the release of hazardous PFAS substances at, within or upon the Bolmar Street faciality have been and are consistent with the National Contingency Plan, 40 C.F.R. Part 300.

94.     Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances and PFAS that have contaminated Plaintiff's water supply.

95.     By reason of the foregoing, Defendant is liable for Plaintiff's necessary response costs, and damages, regarding the presence of hazardous substances and PFAS contamination in Plaintiff's water supply.

## COUNT II
**Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)**

96.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

97.     By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C.

§ 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in Plaintiff's water system as referenced herein.

98.     A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendant is liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

99.     A declaratory judgment will establish Defendant's allocation of costs associated with addressing the contamination of the water supply, insuring an equitable and efficient response to the problem.

100.    Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's water supply.

101.    Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its water supply with hazardous substances and PFAS.

102.    Plaintiff's future costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

103.    Plaintiff is thus entitled to a declaratory judgment regarding Defendant's liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## COUNT III
## PENNSYLVANIA HAZARDOUS SITES CLEANUP ACT

104.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

105.    Defendant's Bolmar Street facility qualifies as a "site" under the definition provided in §103 of Pennsylvania's Hazardous Sites Cleanup Act, Act 108 of 1988 ("**HSCA**").

106.    Defendant is an "owner" and/or "operator" as defined in §103 of the HSCA.

107.    PFOS and PFOA are "Hazardous Substances" under the HSCA, which defines that term in §103 of the Act.

108.    Defendant is responsible for the release of contaminants and hazardous substances.

109.    As set forth above, Defendant has caused and continues to cause the release, or the substantial threat of release, of contaminants and hazardous substances such as PFOS and PFOA from the Bolmar Street Facility, which release, and releases present a substantial danger to the public health, Plaintiff and the environment.

110.    The releases and threatened releases of contaminants and hazardous substances from Defendant's facility constitute a public nuisance under Section 1101 of the HSCA.

111.    The releases and threatened releases of contaminants and hazardous substances by Defendant constitute unlawful conduct under Section 1108 of the HSCA.

112.    Pursuant to Sections 507, 702 and 1101 of the HSCA, Defendant is strictly liable for the costs incurred or to be incurred by the response to the releases and threatened release of contaminants and hazardous substances.

## COUNT IV
### Negligence

113.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

114.    Defendant owed and owes a duty of care to Plaintiff to use, handle, store, process, transport, contain, and dispose of hazardous chemical products in a safe and reasonable manner. It

also owed a duty to not cause or permit, by action, failure to act or failure to timely act, releases of hazardous, toxic or noxious substances into the environment.

115.    Defendant breached its duty by negligently using, handling, storing, processing, transporting, releasing, disposing of, and/or discharging PFOS, PFOA, PFNA, and/or their chemical precursors at the Bolmar Street facility, even when they knew or should have known about the dangers these toxic chemicals posed to Plaintiff's drinking water supply.

116.    Defendant further breached its duty or duties by failing to respond to, arrest, contain, and/or stem the transport and migration of the surface water contamination they caused or contributed to in order to prevent it from reaching Plaintiff's drinking water supply.

117.    Defendant knew or should have known that safety precautions would be required to prevent the release of PFOS, PFOA, PFNA, and/or their chemical precursors into the surrounding environment.

118.    Defendant knew or should have known that the improper use, transport, storage, handling, release, discharge, and/or disposal of PFOS, PFOA, PFNA, and/or their chemical precursors was hazardous to the environment and to human health.

119.    Defendant owed and owes a duty to Plaintiff to ensure that its manufacturing, chemical handling, and waste management activities at the Bolmar Street facility were performed in a safe manner in order to prevent the toxic exposure and imminent and substantial health threat to Plaintiff's drinking water supply. Such duty required, among other things, that Defendant test and monitor both on and off premises for the environmental presence of the chemicals used or made at the facility.

120.    Knowing of the dangerous and hazardous properties of PFOS, PFOA, and PFNA, Defendant had a duty to warn of the hazards associated with the chemicals entering and poisoning

the environment and drinking water. In particular, Defendant had a duty to notify and warn governmental entities and utilities in the area of the Bolmar Street facility (of which Plaintiff was one).

121.    Upon learning of the release of the contaminants, Defendant owed a duty to warn and notify Plaintiff of the release of the contamination before it polluted Plaintiff's drinking water supply.

122.    Defendant's failure to act and to notify Plaintiff in a timely manner of the contamination of its drinking water supply,  or the threat to same, and, consequently, the presence of PFOS, PFOA, and PFNA in that water supply constitutes another breach of the duties Defendant owed to Plaintiff.

123.    Defendant further breached its duty to Plaintiff by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

124.    Negligence may exist both as an omission as well as an affirmative act. A cause sounding in negligence allows for recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.

125.    As such, Defendant negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally breached its legal duty or duties to Plaintiff, proximately causing the contamination of Plaintiff's drinking water supply.

126.    As a direct and proximate result of Defendant's acts and omissions as alleged herein, Plaintiff has suffered damages from contamination of its drinking water supply with PFAS chemicals, including the costs incurred and to be incurred in investigating and responding to that contamination, capital costs for treatment systems along with piping and other modifications to the

supply system, past and future operation and maintenance of the treatment system, the cost of repair or restoration, investigative costs, engineering costs, and sampling costs. These harms are continuing and will cause Plaintiffs to suffer further and continuing harm and losses.

127.    Defendant knew it was substantially certain that its acts and omissions described above would cause injury and damage by contaminating Plaintiff's drinking water supply with PFOS, PFOA, and PFNA. Defendant's actions in causing said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for the rights, health, and property of Plaintiff and Plaintiff's customers.

128.    Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Defendant and that fairly reflects the aggravating circumstances alleged herein.

## <u>COUNT V</u>
### Public Nuisance

129.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

130.    Defendant owns and operates the Bolmar Street facility where PFOS, PFOA, PFNA, and/or their chemical precursors were used, transported, stored, handled, released, discharged, and/or disposed of for decades in a dangerous way.

131.    Defendant has used, transported, stored, handled, released, discharged, and/or disposed of PFOS, PFOA, PFNA, and/or their chemical precursors in a manner that created a public nuisance and that unreasonably injured Plaintiff, causing inconvenience and annoyance.

132.    The improper use, handling, storage, release, discharge, and/or disposal of PFOS, PFOA, PFNA, and/or their chemical precursors has contaminated both the environment and Plaintiff's rights as a public utility, property interests, and drinking water supply, thus causing a

public nuisance. Defendant's conduct, acts and activities set forth herein constitute statutory nuisance under Acts of the Pennsylvania.

133.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFOS, PFOA, and/or PFNA to contaminate surface and groundwater causing a substantial interference with Plaintiff's drinking water supply in West Chester.

134.    Defendant's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOS, PFOA, and PFNA to be released into Plaintiff's drinking water supply, interfering with the health, safety, or comfort of a considerable number of members of the public.

135.    The potential dangers posed by PFOS, PFOA, and PFNA have caused Plaintiff significant annoyance, inconvenience and expense, past, current, and future, by interfering with its Water System.

136.    The public nuisance caused by Defendant has substantially and unreasonably interfered with, obstructed, and/or threatened, among other things, the Plaintiff's interests in the Waters of the Commonwealth, as well as the Plaintiff's ability to protect, conserve and manage its Water System.

137.    The public nuisance caused by Defendant is of a continuing nature and has produced a long-lasting effect upon the waters of the Commonwealth, a resulting harmful impact Defendant knew or had reason to know at all times material hereto was likely to occur.

138.    As a direct and proximate result of Defendant's acts and omissions creating the above-described nuisance, Plaintiff has suffered damages from contamination of its drinking water supply with PFAS chemicals, including the costs incurred and to be incurred in responding to that

contamination, capital costs for treatment systems along with piping and other modifications to the supply system, past and future operation and maintenance of the treatment system, the cost of repair or restoration, investigative costs, engineering costs, and sampling costs.

139.    Defendant is liable to Plaintiff for all resulting damages, including the costs incurred and to be incurred in responding to the contamination of Plaintiff's drinking water supply with PFOS, PFOA, and PFNA.

140.    The resulting harm and losses suffered by Plaintiff is peculiar to itself as a regional utility and they differ materially and substantially in nature, type and/or degree than that suffered by the general public.

141.    On information and belief, Defendant's conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Defendant and that fairly reflects the aggravating circumstances alleged herein.

142.    Defendant's actions and omissions in causing PFAS to enter and pollute the waters of the Commonwealth violate, *inter alia*, HSCA, *supra*; the Pennsylvania Storage Tank and Spill Prevention Act, 35 P.S. §§ 6021.101 *et seq*., and the Pennsylvania Clean Streams Law, "35 P.S. § 691.1 et seq. constitute a public nuisance *per se* under Pennsylvania law.

## COUNT VI
### Private Nuisance

143.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

144.    Defendant owns and operates the Bolmar Street facility where PFOS, PFOA, PFNA, and/or their chemical precursors were used, transported, stored, handled, released, discharged, and/or disposed of for decades in a dangerous way.

145.    The improper use, handling, storage, release, discharge, and/or disposal of PFOS, PFOA, PFNA, and/or their chemical precursors has contaminated both the environment and Plaintiff's property and drinking water supply creating a private nuisance.

146.    The private nuisance caused by Defendant has substantially and unreasonably interfered with, obstructed, and/or threatened, among other things, the Plaintiff's interests in the waters of the Commonwealth, as well as the Plaintiff's ability to protect, conserve and manage its public water system water supply resource.

147.    The private nuisance caused by Defendant is of a continuing nature and has produced a long-lasting effect upon the waters of the Commonwealth, a resulting harmful impact Defendant knew or had reason to know at all times material hereto was likely to occur.

148.    The above-described affirmative, voluntary, and intentional acts were performed with reckless disregard of the potential for PFOS, PFOA, and PFNA to be disbursed through the water causing a substantial interference with the drinking water supply upon which Plaintiff relies.

149.    Defendant's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOS, PFOA, and PFNA to be released into Plaintiff's drinking water supply and unreasonably interfered with Plaintiff's ability to serve clean and safe water to its customers.

150.    The potential dangers posed by PFOS, PFOA, and PFNA have caused Plaintiff significant inconvenience and expense, interfering with West Chester's drinking water supply.

151.    As a direct and proximate result of Defendant's acts and omissions creating the above-described nuisance, Plaintiff has suffered damages from contamination of its drinking water supply with PFAS chemicals, including the costs incurred and to be incurred in responding to that contamination, capital costs expended on treatment systems along with piping and other

modifications to the supply system, past and future operation and maintenance of the treatment system, the cost of repair or restoration, investigative costs, engineering costs, and sampling costs.

152.    Defendant is liable to Plaintiff for all resulting damages, including the costs incurred and to be incurred in responding to the contamination of Plaintiff's drinking water supply with PFOS, PFOA, and/or PFNA.

153.    On information and belief, Defendant's conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Defendant and that fairly reflects the aggravating circumstances alleged herein.

<u>**COUNT VII**</u>
**Statutory Violations and Nuisance**

154.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

155.    Defendant's actions and omissions in discharging, releasing, and otherwise causing PFAS to enter and pollute the waters of the Commonwealth violate or will eventually violate, *inter alia*, the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. §§ 6020.101 -.1305 ("HSCA"); the Pennsylvania Storage Tank and Spill Prevention Act (if and to the extent the releases of PFAS came from regulated storage tanks), and the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.1 *et seq*., to the extent PFAS were discharged or released into the Waters of the Commonwealth. Such violations constitute a public nuisance *per se* under Pennsylvania law.

156.    The direct harms and statutory public nuisance caused and inflicted by Defendant's violations of one or more of these Pennsylvania environmental laws, which are intended to protect Plaintiff and other Commonwealth Citizens, have substantially and unreasonably interfered with, obstructed and/or threatened, among other things, Plaintiff's interests in the waters of the

Commonwealth, as well as the Plaintiff's ability to protect, conserve and manage its Water System in order to provide clean and safe drinking water to its customers.

157.    The statutory public nuisance caused by Defendant is of a continuing nature and has produced a long-lasting effect upon the waters of the Commonwealth, a resulting harmful impact Defendant knew or had reason to know at all times material hereto was likely to occur.

## COUNT VIII

### Negligent Failure to Warn

158.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

159.    Defendant failed to employ the care that a reasonably prudent person would employ under the circumstances by improperly using, transporting, storing, handling, releasing, discharging, and/or disposing of PFOS, PFOA, PFNA, and/or their chemical precursors at the Bolmar Street facility, which led to their release into the soil, surface water, groundwater, and immediate environment.

160.    Defendant knew or should have known that the manner in which PFOS, PFOA, PFNA, and/or their chemical precursors were used, transported, stored, handled, released, discharged, and/or disposed of at the Bolmar Street facility could and/or would result in the contamination of Plaintiff's drinking water supply.

161.    Defendant has negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally caused the immediate and continuing contamination of water and soil that threatens to further contaminate the drinking water supply of area residents.

162.    Defendant had a duty to warn Plaintiff that the aforementioned releases of toxic substances, including but not limited to PFOS, PFOA, and PFNA, had occurred and that migration

of those substances could foreseeably contaminate the area in Chester County that Plaintiff relies on for Water System.

163.    Defendant breached that duty by failing to warn or timely warn Plaintiff about the release and/or migration of PFAS from the Bolmar Street facility, which has led to the contamination of Plaintiff's drinking water supply with PFOS, PFOA, and PFNA.

164.    As a result of Defendant's breach of its duties to warn, Plaintiff was forestalled from undertaking timely and effective measures to remediate the contamination, forcing Plaintiff to expend millions of dollars and significant resources to test, monitor, and remediate the effects of Defendant's negligence now and for many years into the future.

165.    As a direct and proximate result of Defendant's acts and omissions as alleged herein, Plaintiff has suffered damages from contamination of its drinking water supply with PFAS chemicals, including the costs incurred and to be incurred in responding to that contamination, capital costs for treatment systems along with piping and other modifications to the supply system, past and future operation and maintenance of the treatment system, the cost of repair or restoration, investigative costs, engineering costs, and sampling costs.

166.    On information and belief, Defendant's conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Defendant and that fairly reflects the aggravating circumstances alleged herein.

## COUNT IX
### Trespass

167.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

168.    Defendant's tortious acts, omissions and/or activities set forth above were committed or allowed to occur intentionally or under circumstances the resulting harmful effects proximately caused were substantially certain to happen, occur or materialize.

169.    Defendant's intentional acts and/or omissions caused toxic substances, including but not limited to PFOS, PFOA, and PFNA, to be spilled, discharged, and/or released into the environment at the Bolmar Street facility, leading to the intrusion of contaminated water into Plaintiff's drinking water supply which was substantially certain to occur under the circumstances.

170.    Defendant's intentional acts and/or omissions caused toxic substances, including but not limited to PFOS, PFOA, and PFNA, to enter and trespass upon Plaintiff's land, property and utility rights without consent and interfered with Plaintiff's exclusive possession and/or right of possession, resulting in a non-permissive entry of contaminated groundwater entering Plaintiff's property and drinking water supply.

171.    Upon information and belief, Defendant affirmatively, voluntarily, and intentionally failed to act in a manner that would prevent further migration of the contaminants into Plaintiff's drinking water supply.

172.    Defendant knew or should have known that failing to properly remediate the contamination would, by the forces of nature, inevitably result in a trespass, or further trespass, upon Plaintiff's property and exacerbate the harm to Plaintiff's drinking water supply.

173.    Defendant's actions in improperly using, transporting, storing, handling, releasing, discharging, and/or disposing of PFOS, PFOA, PFNA, and/or their chemical precursors were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's and Plaintiff's customers' rights, health, and property.

174.    As a direct and proximate result of the foregoing trespass by Defendant, Plaintiff has suffered damages from contamination of its drinking water supply with PFAS chemicals, including the costs incurred and to be incurred in responding to that contamination, capital costs for treatment systems along with piping and other modifications to the supply system, past and future operation and maintenance of the treatment system, the cost of repair or restoration, investigative costs, engineering costs, and sampling costs.

175.    On information and belief, Defendant's conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendant and that fairly reflects the aggravating circumstances alleged herein.

## COUNT X

### Negligence *Per Se*

176.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

177.    Defendant had a duty to comply with applicable laws, regulations, and guidelines applicable to persons using, transporting, storing, handling, releasing, discharging, and/or disposing of hazardous materials, including but not limited to PFOS, PFOA, and PFNA

178.    Upon information and belief, Defendant failed to operate the Bolmar Street facility in compliance with the applicable laws and regulations relevant to air, soil, and water quality protection. These laws and regulations were intended for the protection of public and private health, safety, property, and economic interests.

179.    Plaintiff is a member of the group(s) whose protection was intended by the drafters of such laws and regulations.

180.    These violations were a direct and proximate cause of the substantial damages and imminent, substantial, and impending harm to Plaintiff's drinking water supply.

181.    The risk of damages and the imminent, substantial, and impending harm to Plaintiff are precisely the types of injuries the applicable laws were designed to prevent.

182.    Violations of these laws and regulations thereby constitute *per se* negligence. The amount of damages for the injuries will be established at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.  Compensatory damages;

B.  Punitive damages;

C.  Reasonable fees for attorneys and expert witnesses where available under law;

D.  Costs and expenses of this lawsuit;

E.  Interest on the damages according to law;

F.  Such equitable relief as is necessary and warranted to abate the nuisance or nuisances created by Defendant; and

G.  Any other and further relief as the Court deems just, proper and equitable

## JURY DEMAND

Plaintiff demands a trial by jury of 12 members on all claims asserted in this Amended Complaint so triable.

Dated: March 3, 2025                  /s/      Michael Coren_____
                                      **COHEN PLACITELLA & ROTH, PC**
                                      Robert L. Pratter, Esq. (PA Bar No. 02556)
                                      Michael Coren, Esq. (PA Bar No. 31037)
                                      Eric S. Pasternack (PA Bar No. 320127)
                                      Jared M. Placitella (PA Bar No. 321333)

Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
Tel: 215-567-3500
Fax: 215-567-6019
*Attorneys for Plaintiff*

**Of Counsel:**

**NSPR LAW**
Paul J. Napoli, Esq. (*Pro Hac Vice Forthcoming*)
1302 Avenida Ponce de León
San Juan PR 00907-3982
Tel. (833) 271-4502
pnapoli@nsprlaw.com

**NAPOLI SHKOLNIK**
Andrew W. Croner, Esq. (*Pro Hac Vice Forthcoming*)
James L. Simpson, Esq. (*Pro Hac Vice Forthcoming*)
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
JSimpson@napolilaw.com
acroner@napolilaw.com